**Theodore S. BURR, Plaintiff below, Appellant,**

v.

**ATLANTIC AVIATION CORPORATION, a Delaware Corporation, Defendant below, Appellee.**

Supreme Court of Delaware.

Argued June 11, 1975.

Decided Nov. 5, 1975.

Ben T. Castle, of Young, Conaway, Stargatt & Taylor, Wilmington, for appellant.

Rodney M. Layton and Allen M. Terrell, Jr., of Richards, Layton & Finger, Wilmington, for appellee.

Before HERRMANN, Chief Justice, Mc-NEILLY, Justice, and BROWN, Vice-Chancellor.

McNEILLY, Justice:

Theodore Burr, a former pilot for Atlantic Aviation Corporation (Atlantic) appeals from the granting of Atlantic's motion for summary judgment in this libel-slander action arising from allegedly defamatory communications to E. I. duPont de Nemours & Company, Inc. ("duPont") concerning the crash landing of a duPont plane co-piloted by Burr. The Superior Court held that the communications were privileged and that the evidence did not raise a triable factual question of abuse of that privilege. See 332 A.2d 154.

I

Atlantic, under contract to maintain and fly certain duPont planes, dispatched a pilot and co-pilot (Burr) to fly three duPont employees to Athens, Georgia. As the plane approached the airport, the weather conditions were poor and dangerous—low-cloud ceiling, fog, rain and extremely poor visibility. At an altitude of 70 feet, the plane suddenly experienced an unusually great sink rate, and landed with sharp impact causing landing gear damage but no personal injuries. An investigation ensued to determine the cause of the accident.

The pilot stated in his deposition that he descended below minimum descent altitude but in accordance with FAA * Regulations which permitted him to do so when " . . . markings identifiable with the approach end of that runway are clearly visible . . ."; that he identified numerous houses on the highway when he was "about 2 miles out"; that he saw the runway ¾ mile out at a height of 300 feet; that he then moved the flaps to the full down position, and felt Burr's hand move to the flap control lever, in accordance with practice, to bring the flaps to the neutral or approach position immediately prior to landing.

Burr stated in his deposition that because of weather conditions he told the pilot they should proceed to an alternate landing site. He contended that the pilot was in charge and responsible for making the final decision; that the pilot saw only glimpses of the ground at two miles out at 100 to 150 feet altitude; and that the pilot caused the accident by breeching FAA regulations prohibiting a plane's approach to the Athens airport before the landing strip could be seen at a distance of one mile away (visible to them at ¾ mile), by ignoring at least two more warnings not to land, and by raising the flaps in an attempt to execute a "missed approach" (the flaps were in an up position after the accident). Burr reported this information to the investigating officers at Atlantic, and he further maintained throughout the investigation that he did not touch the flap control lever.

Three weeks after the accident Atlantic sent to duPont a written report, strongly suggesting Burr's responsibility, which Burr's counsel was not permitted to see and which Burr was permitted to see only briefly. The report concluded under "Cause Factor" :

". . . it is probable that the flaps upon reaching full down, were inadvertently raised to the up position. This may have occurred in one of two different ways:

1. The pilot could have raised the flaps from the down position to the approach position; the co-pilot, not witnessing this move and attempting to personally perform this task, raised them from the approach position to the up position and the pilot and co-pilot actions could have been reversed.

2. The pilot or co-pilot could have raised the flap selector from the full down to full up . . ."

* Federal Aviation Administration.

This report also indicated that "Disciplinary Action" had been taken: a letter of warning to the pilot and a three day suspension of Burr for failing to read an instruction card to the passengers (unrelated to the accident).

The Director of Transportation and Distribution of duPont informed the Chairman of the Board of Atlantic that he was dissatisfied in that the report did not clearly establish causation, dissatisfied with the disciplinary action and disturbed about the overall relationship between duPont and Atlantic. Two days later, the pilot was placed on early retirement, and Burr was removed summarily from flight status (unjustly and unfairly so, according to an Atlantic pilot-employee who investigated the accident).

Thereafter, a revised report was furnished adding in the "Cause Factor" portion:

"Neither the pilot nor the co-pilot recall having put the flaps in the full up position. In view of the procedures then in use and in the absence of any malfunction it is probable that one or the other did put the flaps in the full up position without their being aware of the action."

"In the absence of any mechanical or electrical malfunction, the probable primary cause of the accident was the failure of the pilot in command to maintain crew coordination in the cockpit."

"In summary, it is our opinion the cause of the accident was the inadvertent retraction of the flaps by a member of the crew."

Neither of these reports were made available to Burr's counsel; nor did they include Burr's causation contentions or any of the investigative conclusions of the FAA, which may not have been available at the time, but which Atlantic should have known would be forthcoming. Those conclusions of FAA were:

"Probable Cause(s)

Pilot in Command—Improper Level off Factor(s)

Pilot in Command—Failed to Follow Approved Procedures, Directives, etc.

Pilot in Command—Improper IFR Operation

Weather—Low Ceiling

Miscellaneous Acts, Conditions—Overload Failure"

II

Burr agrees that Atlantic was acting under a conditional privilege in its communications with duPont, but argues that the propriety of Atlantic's exercise of that privilege should be resolved by a jury because of Atlantic's malicious reporting of half-truths which implicated him as a responsible party and effectively ruined his professional career as a pilot.

A qualified privilege must be exercised with good faith, without malice and absent any knowledge of falsity or desire to cause harm. *Snavely v. Booth,* Del.Super., 176 A. 649 (1935); *Pierce v. Burns,* Del.Supr., 185 A.2d 477 (1962), *Short v. News Journal,* Del.Super., 205 A.2d 6 (1965), *Restatement of Torts* § 569, Comment e.

The question whether a conditional privilege has been abused by malice or intent to harm ordinarily is a factual question for the jury, *Pierce v. Burns,* supra; *Short v. News Journal Co.,* supra, *Restatement of Torts,* § 619, unless, of course, the evidence when considered in a light most favorable to plaintiff is insufficient to raise a factual question upon which reasonable men might differ. *Ebersole v. Lowengrub,* Del.Supr., 180 A.2d 467 (1962).

Here, Atlantic's final disciplinary action, withholding of known facts, failure

to await reports of causation from other known sources, and withholding of the reports from Burr's counsel in light of Atlantic's already strained relationship with duPont, is sufficient evidence from which a jury might conclude that the communications constituted malicious and intentional reporting of half-truths.

The granting of summary judgment was error.

\*     \*     \*     \*     \*     \*

Reversed and remanded.